**PUBLISH**
**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

DAVID F. BANDIMERE,

     Petitioner,

v.

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

     Respondent.

_____

IRONRIDGE GLOBAL IV, LTD;
IRONRIDGE GLOBAL PARTNERS,
LLC,

     Amici Curiae.

No. 15-9586

_____

**PETITION FOR REVIEW OF AN ORDER OF THE SECURITIES AND**
**EXCHANGE COMMISSION**
**(SEC No. 3-15124)**

_____

David A. Zisser, Jones & Keller P.C., Denver, Colorado, appearing for Petitioner.

Lisa K. Helvin, Senior Counsel, Securities and Exchange Commission, Washington, DC,
and Mark B. Stern, Attorney, Appellate Staff Civil Division, United States Department of
Justice, Washington, DC (Benjamin C. Mizer, Principal Deputy Assistant Attorney
General; Beth S. Brinkmann, Deputy Assistant Attorney General; Mark R. Freeman,
Melissa N. Patterson, Megan Barbero, Daniel Aguilar, and Tyce R. Walters, Attorneys,
Appellate Staff, Civil Division, United States Department of Justice, Washington, DC;
Anne K. Small, General Counsel; Michael A. Conley, Solicitor; and Dominick V. Freda,
Senior Litigation Counsel, Securities and Exchange Commission, Washington, DC, with
them on the brief), appearing for Respondent.

Paul D. Clement, Jeffrey M. Harris, and Christopher G. Michel, Bancroft PLLC, Washington, DC, filed an amicus curiae brief for Ironridge Global Partners, LLC.

Before **BRISCOE, MCKAY,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

When the Framers drafted the Appointments Clause of the United States Constitution in 1787, the notion of administrative law judges ("ALJs") presiding at securities law enforcement hearings could not have been contemplated. Nor could an executive branch made up of more than 4 million people,[1] most of them employees. Some of them are "Officers of the United States," including principal and inferior officers, who must be appointed under the Appointments Clause. U.S. Const. art. II, § 2, cl. 2. In this case we consider whether the five ALJs working for the Securities and Exchange Commission ("SEC") are employees or inferior officers.

Based on *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868 (1991), we conclude the SEC ALJ who presided over an administrative enforcement action against Petitioner David Bandimere was an inferior officer. Because the SEC ALJ was not constitutionally appointed, he held his office in violation of the Appointments Clause.

---

[1] Office of Pers. Mgmt., Historical Federal Workforce Tables, https://perma.cc/LZ7P-EPAG. The first census in 1790 counted 3.9 million inhabitants in the United States. U.S. Census Bureau, 1790 Overview, https://perma.cc/EYF2-4K2L. The Perma.cc links throughout this opinion archive the referenced webpages.

Exercising jurisdiction under 15 U.S.C. §§ 77i(a) and 78y(a)(1), we grant Mr.

Bandimere's petition for review.

## I. BACKGROUND

The SEC is a federal agency with authority to bring enforcement actions for

violations of federal securities laws. 15 U.S.C. §§ 77h-1, 78d, 78*o*, 78u-3. An

enforcement action may be brought as a civil action in federal court or as an

administrative action before an ALJ. In 2012, the SEC brought an administrative action

against Mr. Bandimere, a Colorado businessman, alleging he violated various securities

laws. An SEC ALJ presided over a trial-like hearing. The ALJ's initial decision

concluded Mr. Bandimere was liable, barred him from the securities industry, ordered

him to cease and desist from violating securities laws, imposed civil penalties, and

ordered disgorgement. David F. Bandimere, SEC Release No. 507, 2013 WL 5553898,

at *61-84 (ALJ Oct. 8, 2013).

The SEC reviewed the initial decision and reached a similar result in a separate

opinion. David F. Bandimere, SEC Release No. 9972, 2015 WL 6575665 (Oct. 29,

2015). During the SEC's review, the agency addressed Mr. Bandimere's argument that

the ALJ was an inferior officer who had not been appointed under the Appointments

Clause. *Id.* at *19. The SEC conceded the ALJ had not been constitutionally appointed,

but rejected Mr. Bandimere's argument because, in its view, the ALJ was not an inferior

officer. *Id.* at *19-21.

Mr. Bandimere filed a petition for review with this court under 15 U.S.C. §§ 77i(a)

- 3 -

and 78y(a)(1), which allow an aggrieved party to obtain review of an SEC order in any circuit court where the party "resides or has his principal place of business." In his petition, Mr. Bandimere raised his Appointments Clause argument and challenged the SEC's conclusions regarding securities fraud liability and sanctions.[2]

## II. **DISCUSSION**

The SEC rejected Mr. Bandimere's argument that the ALJ presided over his hearing in violation of the Appointments Clause. We review the agency's conclusion on this constitutional issue de novo. *Hill v. Nat'l Transp. Safety Bd.*, 886 F.2d 1275, 1278 (10th Cir. 1989). We first explain why we must address Mr. Bandimere's constitutional argument and then address its merits.

### A. *Constitutional Avoidance*

Federal courts avoid unnecessary adjudication of constitutional issues. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 294 (1982). Here, we must consider the Appointments Clause issue.

---

[2] Other SEC respondents have attacked the validity of SEC ALJs by filing collateral lawsuits attempting to enjoin administrative enforcement actions. Circuit courts have rejected these attempts, holding that federal courts lacked jurisdiction because the respondents had failed to raise and exhaust the argument in the administrative proceedings. *See, e.g.*, *Hill v. SEC*, 825 F.3d 1236 (11th Cir. 2016); *Tilton v. SEC*, 824 F.3d 276 (2d Cir. 2016); *Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015); *Bebo v. SEC*, 799 F.3d 765 (7th Cir. 2015). Here, Mr. Bandimere did not file a collateral lawsuit. He instead raised his constitutional argument before the SEC, which rejected it. We therefore have jurisdiction to address the Appointments Clause issue as properly presented in Mr. Bandimere's petition for review.

In its opinion, the SEC concluded Mr. Bandimere committed two securities fraud violations and two securities registration violations.[3] In his petition for review, Mr. Bandimere challenges the SEC's findings of securities fraud liability as arbitrary and capricious, but he does not challenge the registration violations on these non-constitutional grounds. He attacks the SEC's opinion as a whole, however, including both his securities fraud and registration liability, based on the Appointments Clause.[4] Because the sole argument attacking his registration liability is constitutional, we cannot avoid the Appointments Clause question. And because resolving this question relieves Mr. Bandimere of all liability, we need not address his remaining arguments on securities fraud liability.

## B. *Appointments Clause Overview*

The Appointments Clause states:

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall

---

[3] Specifically, the SEC held him liable for (1) securities fraud under Section 17(a) of the Securities Act of 1933 ("Securities Act"), Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), and 17 C.F.R. § 240.10b-5; (2) failure to register as a broker before selling securities under Exchange Act Section 15(a); and (3) failure to register the securities he was selling under Securities Act Sections 5(a) and (c). SEC Release No. 9972, 2015 WL 6575665, at *2, *4, *7, *17.

[4] Mr. Bandimere's petition states, "The [SEC's] Opinion must be vacated because it resulted from a process in which an improperly appointed inferior officer played an integral role." Aplt. Br. at 18; *see also id.* at 10, 13.

be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

The Appointments Clause embodies both separation of powers and checks and balances. *Ryder v. United States*, 515 U.S. 177, 182 (1995) ("The Clause is a bulwark against one branch aggrandizing its power at the expense of another branch . . . .").[5] By defining unique roles for each branch in appointing officers, the Clause separates power. It also checks and balances the appointment authority of each branch by providing (1) the President may appoint principal officers only with Senate approval and (2) Congress may confer appointment power over inferior officers to the President, courts, or department heads but may not itself make appointments.[6]

---

[5] James Madison argued in Federalist Nos. 48 and 51 that checks and balances are needed to sustain a workable separation of powers. The Federalist Nos. 48 and 51, at 308, 318-19 (James Madison) (Clinton Rossiter ed., 1961); *see also* M.J.C. Vile, Constitutionalism and the Separation of Powers 153, 159-60 (1967).

[6] In Federalist No. 76, Alexander Hamilton explained the Senate-approval requirement "would be an excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters from State prejudice, from family connection, from personal attachment, or from a view to popularity." The Federalist No. 76, at 456 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

In *Weiss v. United States*, 510 U.S. 163 (1994), the Supreme Court stated the Framers structured "an alternative appointment method for inferior officers" to promote "accountability and check governmental power: any decision to dispense with Presidential appointment and Senate confirmation is Congress's to make, not the President's, but Congress's authority is limited to assigning the appointing power to the highly accountable President or the heads of federal departments, or, where appropriate, to the courts of law." 510 U.S. at 187.

The Appointments Clause also promotes public accountability by identifying the public officials who appoint officers. *Edmond v. United States*, 520 U.S. 651, 660 (1997). And it prevents the diffusion of that power by restricting it to specific public officials. *Ryder*, 515 U.S. at 182; *Freytag*, 501 U.S. at 878, 883. "The Framers understood . . . that by limiting the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people." *Freytag*, 501 U.S. at 884.

## C. *Inferior Officers and* **Freytag**

### 1. **Inferior Officers and the Supreme Court**

The Supreme Court has defined an officer generally as "any appointee exercising significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). The term "inferior officer" "connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Edmond*, 520 U.S. at 662.[7]

---

[7] Other uses of "inferior" in the Constitution confirm the term speaks to a hierarchical, subordinate-superior relationship. The word appears once in Article I and twice in Article III, each time describing courts "inferior" to the Supreme Court. U.S. Const. art. I, § 8, cl. 9; *id.* art. III, § 1; *see also* Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 805-07 (1999) (discussing the use of "inferior" in Articles I, II, and III).

Statements from Alexander Hamilton and James Madison also indicate "inferior" means subordinate. In Federalist No. 81, Hamilton described inferior courts as those "subordinate to the Supreme." The Federalist No. 81, at 484 (Alexander Hamilton) (Clinton Rossiter ed., 1961). In the brief debate about the Excepting Clause at the Federal Constitutional Convention in 1787, Madison "mention[ed] (as in apparent

Continued . . .

This description of "inferior" may aid in understanding the distinction between principal and inferior officers. But we are concerned here with the distinction between inferior officers and employees. Like inferior officers, employees—or "lesser functionaries"—are subordinates. *Buckley*, 424 U.S. at 126 n.162.

Justice Breyer has provided this summary of the different ways the Supreme Court has described inferior officers:

> Consider the [Supreme] Court's definitions: Inferior officers are, *inter alia*, (1) those charged with "the administration and enforcement of the public law," *Buckley*, 424 U.S. at 139; (2) those granted "significant authority," *id.* at 126; (3) those with "responsibility for conducting civil litigation in the courts of the United States," *id.* at 140; and (4) those "who can be said to hold an office," *United States v. Germaine*, 99 U.S. 508, 510 (1879), that has been created either by "regulations" or by "statute," *United States v. Mouat*, 124 U.S. 303, 307-08 (1888).

*Free Enter. Fund v. PCAOB*, 561 U.S. 477, 539 (2010) (Breyer, J., dissenting) (citation style altered and some citations omitted).

The list below contains examples of inferior officers drawn from Supreme Court cases spanning more than 150 years:

_____

Cont.

contrast to the 'inferior officers' covered by the provision) 'Superior Officers.'" *Morrison v. Olson*, 487 U.S. 654, 720 (1988) (Scalia, J., dissenting) (citing 2 The Records of the Federal Convention of 1787 627-28 (M. Farrand ed., rev. ed. 1966)). He also referred to "subordinate officers" in contradistinction to "principal officers" when explaining the appointment power during the Virginia ratification convention. 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 409-10 (Jonathan Elliot ed., 2d ed. 1836); *see also* Tuan Samahon, *Are Bankruptcy Judges Unconstitutional? An Appointments Clause Challenge*, 60 Hastings L.J. 233, 251 (2008) (discussing Madison's remarks at the Virginia convention).

- a district court clerk, *In re Hennen*, 38 U.S. (13 Pet.) 230, 258 (1839);

- an "assistant-surgeon," *United States v. Moore*, 95 U.S. 760, 762 (1877);

- "thousands of clerks in the Departments of the Treasury, Interior, and the othe[r]" departments, *Germaine*, 99 U.S. at 511 (1878);

- an election supervisor, *Ex parte Siebold,* 100 U.S. 371, 397-98 (1879);

- a federal marshal, *id.* at 397;

- a "cadet engineer" appointed by the Secretary of the Navy, *United States v. Perkins*, 116 U.S. 483, 484-85 (1886);

- a "commissioner of the circuit court," *United States v. Allred*, 155 U.S. 591, 594-96 (1895);

- a vice consul temporarily exercising the duties of a consul, *United States v. Eaton*, 169 U.S. 331, 343 (1898);

- extradition commissioners, *Rice v. Ames*, 180 U.S. 371, 378 (1901);

- a United States commissioner in district court proceedings, *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 352-54 (1931);

- a postmaster first class, *Buckley*, 424 U.S. at 126 (1976) (citing *Myers v. United States*, 272 U.S. 52 (1926));

- Federal Election Commission ("FEC") commissioners, *id.*;

- an independent counsel, *Morrison v. Olson*, 487 U.S. 654, 671 (1988);

- Tax Court special trial judges, *Freytag*, 501 U.S. at 881-82 (1991); and

- military judges, *Weiss v. United States*, 510 U.S. 163, 170 (1994); *Edmond*, 520 U.S. at 666 (1997).[8]

---

[8] *See also Edmond*, 520 U.S. at 661 (listing examples of inferior officers); *Free Enter. Fund*, 561 U.S. at 540 (Breyer, J., dissenting) (listing examples of officers).

We think these examples are relevant and instructive. Although the Supreme Court has not stated a specific test for inferior officer status, "[e]fforts to define ['inferior Officers'] inevitably conclude that the term's sweep is unusually broad," *Free Enter. Fund*, 561 U.S. at 539 (Breyer, J., dissenting), and the *Freytag* opinion provides the guidance needed to decide this appeal.

2. *Freytag*

The question in *Freytag* was whether the Tax Court had authority to appoint special trial judges ("STJs") under the Appointments Clause. 501 U.S. at 877-92. As a threshold matter, the Court addressed whether STJs were inferior officers or employees. *Id.* at 880-82. That question strongly resembles the one we face here. In our view, *Freytag* controls the result of this case.

Under the then-applicable 26 U.S.C. § 7443A(b), the Tax Court could assign four categories of cases to STJs. *Id.* at 873. For the first three categories, § 7443A(b)(1), (2), and (3), "the Chief Judge [could] assign the special trial judge not only to hear and report on a case but also to decide it." *Id.* In other words, STJs could make final decisions in those cases. But in the fourth category, § 7443A(b)(4), STJs lacked final decision-making power: "the chief judge [could] authorize the special trial judge only to hear the case and prepare proposed findings and an opinion. The actual decision then [was] rendered by a regular judge of the Tax Court." *Id.*

The Tax Court assigned the petitioners' case to the STJ under § 7443A(b)(4), the fourth category, which did not allow STJs to enter final decisions. *Id.* at 871-73. The

- 10 -

STJ issued a proposed opinion concluding the petitioners were liable, and the Tax Court adopted it. *Id.* at 871-72.[9] On appeal, the petitioners argued the STJs were inferior officers under the Appointments Clause and that the chief judge of the Tax Court could not appoint them because he was not the President, a court of law, or a department head. *Id.* at 878. The government contended STJs were not inferior officers because they did not have authority to enter a final decision in petitioners' case. *Id.* at 881.

The Court first expressly approved prior decisions from the Tax Court and the Second Circuit that held STJs were inferior officers. *Id.* "Both courts considered the degree of authority exercised by the special trial judges to be so 'significant' that it was inconsistent with the classifications of 'lesser functionaries' or employees." *Id.* (discussing *Samuels, Kramer & Co. v. Comm'r of Internal Revenue*, 930 F.2d 975 (2d Cir. 1991); *First W. Gov't Sec., Inc. v. Comm'r of Internal Revenue*, 94 T.C. 549 (1990)).[10]

---

[9] As discussed below, *Ballard v. Commissioner of Internal Revenue*, 544 U.S. 40 (2005), spelled out the STJs' and Tax Court judges' collaborative decision-making process in which STJs and Tax Court judges jointly "worked over" STJs' preliminary "in-house drafts" to produce an opinion. 544 U.S. at 42.

[10] In *Samuels*, the Second Circuit concluded STJs are inferior officers. 930 F.2d at 985. It stated:

Although the ultimate decisional authority in cases under section 7443A(b)(4) rests with the Tax Court judges, the special trial judges do exercise a great deal of authority in such cases. The special trial judges are more than mere aids to the judges of the Tax Court. They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to

Continued . . .

The Court then turned to the government's argument that the STJs were employees because they "lack[ed] authority to enter a final decision" under § 7443A(b)(4). *Id.* The Court said the argument "ignore[d] the significance of the duties and discretion that special trial judges possess." *Id.* First, the STJ position was "established by Law." *Id.* (quoting U.S. Const. art. II, § 2, cl. 2). Second, "the duties, salary, and means of appointment for that office are specified by statute." *Id.* "These characteristics," the Court stated, "distinguish special trial judges from special masters, who are hired by Article III courts on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute." *Id.* Third, STJs "perform more than ministerial tasks. They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. In the course of carrying out these important functions, the [STJs]

_____

Cont.

> enforce compliance with discovery orders. Contrary to the contentions of the Commissioner, the degree of authority exercised by special trial judges is "significant." They exercise a great deal of discretion and perform important functions, characteristics that we find to be inconsistent with the classifications of "lesser functionary" or mere employee.

*Id.* at 985-86 (quoting *Buckley*, 424 U.S. at 126).

In *First Western*, the Tax Court concluded STJs are inferior officers: "Because [they] may be assigned any case and may enter decisions in certain cases, it follows that special trial judges exercise significant authority." 94 T.C. at 557.

Although a factor, final decision-making power was not the linchpin of the Tax Court's analysis. *Id.* And in any event, the *Freytag* Court endorsed the Second Circuit's and Tax Court's analyses because they relied on "the degree of authority" STJs possessed. *Freytag*, 501 U.S. at 881.

- 12 -

exercise significant discretion." *Id.* at 881-82. Accordingly, the Court held STJs were inferior officers. *Id.*

Next, the Court addressed a standing argument from the government. *Id.* at 882. The government had conceded STJs act as inferior officers when hearing cases under § 7443A(b)(1), (2), and (3), but argued petitioners "lack[ed] standing to assert the rights of taxpayers whose cases [were] assigned to [STJs] under [those three categories]." *Id.*

The Court stated, "*Even if* the duties of [STJs] under [§ 7443A(b)(4)] were not as significant as we and the two courts have found them to be, our conclusion would be unchanged." *Id.* (emphasis added). The Court explained that an inferior officer does not become an employee because he or she "on occasion performs duties that may be performed by an employee not subject to the Appointments Clause." *Id.* "If a special trial judge is an inferior officer for purposes of subsections (b)(1), (2), and (3), he is an inferior officer within the meaning of the Appointments Clause and he must be properly appointed." *Id.* The Court thus rejected the government's standing argument as "beside the point." *Id.*

In the end, the *Freytag* majority held the Tax Court was a "Cour[t] of Law" with authority to appoint inferior officers like the STJs. *Id.* at 890, 892. Justice Scalia's partial concurrence, joined by three other justices, agreed with the majority's conclusion regarding the STJs' status: "I agree with the Court that a special trial judge is an 'inferior Office[r]' within the meaning of [the Appointments Clause]." *Id.* at 901 (Scalia, J., concurring) (first alteration in original). Thus, a unanimous Supreme Court concluded

- 13 -

STJs were inferior officers.

## D. *SEC ALJs*

The SEC conceded in its opinion that its ALJs are not appointed by the President, a court of law, or the head of a department. SEC Release No. 9972, 2015 WL 6575665, at *19. The sole question is whether SEC ALJs are inferior officers under the Appointments Clause. Under *Freytag*, we must consider the creation and duties of SEC ALJs to determine whether they are inferior officers. 501 U.S. at 881-82.

The APA created the ALJ position. 5 U.S.C. § 556(b)(3); *see also Mullen v. Bowen*, 800 F.2d 535, 540 n.5 (6th Cir. 1986) ("[T]he ALJ's position is not a creature of administrative law; rather, it is a direct creation of Congress under the [APA]."). Section 556 of the APA describes the duties of the "presiding employe[e]" at an administrative adjudication. 5 U.S.C. § 556. It states, "There shall preside at the taking of evidence . . . (1) the agency; (2) one or more members of the body which comprises the agency; or (3) one or more administrative law judges appointed under section 3105 of this title." *Id.* § 556(b).

Under 5 U.S.C. § 3105, "Each agency shall appoint as many administrative law judges as are necessary for proceedings required to be conducted in accordance with [5 U.S.C. §§ 556, 557]." Agencies hire ALJs through a merit-selection process administered by the Office of Personnel Management ("OPM"), which places ALJs within the civil service (i.e., the "competitive service"). 5 U.S.C. § 1302; 5 C.F.R. § 930.201. ALJ applicants must be licensed attorneys with at least seven years of

litigation experience. 5 C.F.R. § 930.204; Office of Pers. Mgmt., Qualification Standard

for Administrative Law Judge Positions, https://perma.cc/2G7J-X5BW. OPM

administers an exam and uses the results to rank applicants. 5 C.F.R. § 337.101.

Agencies may select an ALJ from the top three ranked candidates.[11] The SEC's Chief

ALJ hires from the top three candidates subject to "approval and processing by the

[SEC's] Office of Human Resources." Notice of Filing at 2, Timbervest, LLC, File No.

3-15519, https://perma.cc/G8M2-36P3 (SEC Division of Enforcement filing in

administrative enforcement action). Once hired, ALJs receive career appointments, 5

C.F.R. § 930.204(a), and are removable only for good cause, 5 U.S.C. § 7521. Their pay

is detailed in 5 U.S.C. § 5372. The SEC currently employs five ALJs. Office of Pers.

Mgmt., ALJs by Agency, https://perma.cc/6RYA-VQFV.

The SEC has authority to delegate "any of its functions" except rulemaking to its

ALJs. 15 U.S.C. § 78d-1(a). And SEC regulations task ALJs with "conduct[ing]

hearings" and make them "responsible for the fair and orderly conduct of the

proceedings." 17 C.F.R. § 200.14. SEC ALJs "have the authority to do all things

---

[11] *See* Vanessa K. Burrows, Cong. Res. Serv., Administrative Law Judges: An Overview at 2 (2010), https://perma.cc/T8YY-EE7F; Robin J. Arzt et al., Fed. Admin. Law Judge Found., Advancing the Judicial Independence and Efficiency of the Administrative Judiciary: A Report to the President-Elect of the United States, 29 J. Nat'l Ass'n Admin. L. Judiciary 93, 101 (2009).

necessary and appropriate to discharge [their] duties." 17 C.F.R. § 201.111.[12] The table

below lists examples of those duties.

| Duty | Provision(s) |
|---|---|
| Administer oaths and affirmations | 5 U.S.C. § 556(c)(1) <br> 17 C.F.R. § 200.14(a)(1) <br> 17 C.F.R. § 201.111(a) |
| Consolidate "proceedings involving a common question of law or fact" | 17 C.F.R. § 201.201(a) |
| "Determin[e]" the "scope and form of evidence, rebuttal evidence, if any, and cross-examination, if any" | 17 C.F.R. § 201.326 |
| Enter default judgment | 17 C.F.R. § 201.155 |
| Examine witnesses | 17 C.F.R. § 200.14(a)(4) |
| Grant extensions of time or stays | 17 C.F.R. § 201.161 |
| Hold prehearing conferences | 17 C.F.R. § 200.14(a)(6) |
| Hold settlement conferences and require attendance of the parties | 5 U.S.C. § 556(c)(6) <br> 5 U.S.C. § 556(c)(8) <br> 17 C.F.R. § 201.111(e) |
| Inform the parties about alternative means of dispute resolution | 5 U.S.C. § 556(c)(7) <br> 17 C.F.R. § 201.111(k) |
| Issue protective orders | 17 C.F.R. § 201.322 |
| Issue, revoke, quash, or modify subpoenas | 5 U.S.C. § 556(c)(2) <br> 17 C.F.R. § 200.14(a)(2) <br> 17 C.F.R. § 201.111(b) <br> 17 C.F.R. § 201.232(e) |
| Order and regulate depositions | 17 C.F.R. § 201.233 |
| Order and regulate document production | 17 C.F.R. § 201.230 |
| Prepare an initial decision containing factual findings and legal conclusions, along with an appropriate order | 5 U.S.C. § 556(c)(10) <br> 17 C.F.R. § 200.14(a)(8) <br> 17 C.F.R. § 200.30-9(a) <br> 17 C.F.R. § 201.111(i) <br> 17 C.F.R. § 201.360 |

---

[12] Many of the SEC regulations refer to the duties of the "hearing officer." Under 17 C.F.R. § 201.101(a)(5), a "hearing officer" includes an ALJ. This opinion applies only to SEC ALJs specifically and not to hearing officers generally.

| | |
|---|---|
| Punish contemptuous conduct by excluding a person from a deposition, hearing, or conference or by suspending a person from representing others in the proceeding | 17 C.F.R. § 201.180(a) |
| Regulate the course of the hearing and the conduct of the parties and counsel | 5 U.S.C. § 556(c)(5)<br>17 C.F.R. § 200.14(a)(5)<br>17 C.F.R. § 201.111(d) |
| Reject deficient filings, order a party to cure deficiencies, and enter default judgment for failure to cure deficiencies | 17 C.F.R. § 201.180(b), (c) |
| Reopen any hearing prior to filing an initial decision or prior to the fixed time for the parties to file final briefs with the SEC | 17 C.F.R. § 201.111(j) |
| Rule on all motions, including dispositive and procedural motions | 5 U.S.C. § 556(c)(9)<br>17 C.F.R. § 200.14(a)(7)<br>17 C.F.R. § 201.111(h)<br>17 C.F.R. § 201.220<br>17 C.F.R. § 201.250 |
| Rule on offers of proof and receive relevant evidence | 5 U.S.C. § 556(c)(3)<br>17 C.F.R. § 200.14(a)(3)<br>17 C.F.R. § 201.111(c) |
| Set aside, make permanent, limit, or suspend temporary sanctions the SEC issues | 17 C.F.R. § 200.30-9(b)<br>17 C.F.R. § 201.531 |
| Take depositions or have depositions taken | 5 U.S.C. § 556(c)(4) |

### E. *SEC ALJs Are Inferior Officers Under* **Freytag**

Following *Freytag*, we conclude SEC ALJs are inferior officers under the

Appointments Clause.  As the SEC acknowledges, the ALJ who presided over Mr.

Bandimere's hearing was not appointed by the President, a court of law, or a department

head.  He therefore held his office in conflict with the Appointments Clause when he

presided over Mr. Bandimere's hearing.

*Freytag* held that STJs were inferior officers based on three characteristics.  Those

three characteristics exist here: (1) the position of the SEC ALJ was "established by Law," *Freytag*, 501 U.S. at 881 (quoting U.S. Const. art. II, § 2, cl. 2); (2) "the duties, salary, and means of appointment . . . are specified by statute," *id.*; and (3) SEC ALJs "exercise significant discretion" in "carrying out . . . important functions," *id.* at 882.

First, the office of the SEC ALJ was established by law. The APA established the ALJ position. 5 U.S.C. § 556(b)(3). In addition, the Securities and Exchange Act of 1934 authorizes the SEC to delegate "any of its functions" with the exception of rulemaking to ALJs,[13] and 17 C.F.R. § 200.14, a regulation promulgated under the Act, gives the agency's "Office of Administrative Law Judges" power to "conduct hearings" and "proceedings." *See* 15 U.S.C. § 78d-1(a) (authorizing SEC to delegate functions to ALJs); 17 C.F.R. § 200.1 (stating statutory basis for SEC regulations).

Second, statutes set forth SEC ALJs' duties, salaries, and means of appointment.

---

[13] The dissent's concern about how this opinion might affect the SEC ALJs' role in rulemaking is misplaced. Dissent at 14. SEC ALJs do not have a rulemaking role: the Exchange Act does not allow the SEC to delegate rulemaking authority to its ALJs. 15 U.S.C. § 78d-1(a) ("Nothing in this section shall be deemed . . . to authorize the delegation of the function of rule making . . . ."); *see also Raymond J. Lucia Cos., Inc. v. SEC*, 832 F.3d 277, 281 (D.C. Cir. 2016) (stating "the authority to delegate [does] not extend to the [SEC's] rulemaking authority"). Other agencies' ALJs rarely exercise rulemaking authority. *See, e.g.*, *Perez v. Mortg. Brokers Ass'n*, 135 S. Ct. 1199, 1222 n.5 (2015) (Thomas, J., concurring) ("Today, . . . formal rulemaking is the Yeti of administrative law. There are isolated sightings of it in the ratemaking context, but elsewhere it proves elusive."); Kent Barnett, *Resolving the ALJ Quandary*, 66 Vand. L. Rev. 797 (2013) ("[F]ormal rulemaking is extremely rare . . . ."). Nevertheless, to the extent the dissent is concerned with other ALJs' rulemaking authority, we do not address the issue because our sole question is whether SEC ALJs are inferior officers.

5 U.S.C. §§ 556-57 (duties); *id.* § 5372(b) (salary); *id.* §§ 1302, 3105 (means of appointment).[14]  SEC ALJs are not "hired . . . on a temporary, episodic basis."  *Freytag*, 501 U.S. at 881.  They receive career appointments and can be removed only for good cause.  5 U.S.C. § 7521; 5 C.F.R. § 930.204(a).

Third, SEC ALJs exercise significant discretion in performing "important functions" commensurate with the STJs' functions described in *Freytag*.  SEC ALJs have "authority to do all things necessary and appropriate to discharge his or her duties."[15]  This includes authority to shape the administrative record by taking testimony,[16] regulating document production and depositions,[17] ruling on the admissibility of evidence,[18] receiving evidence,[19] ruling on dispositive and procedural motions,[20] issuing subpoenas,[21] and presiding over trial-like hearings.[22]  When presiding over trial-like

---

[14] The SEC concedes that the way it appoints its ALJs does not comply with the Appointments Clause.  SEC Release No. 9972, 2015 WL 6575665 at *19.

[15] 17 C.F.R. § 201.111.

[16] 5 U.S.C. § 556(b), (c)(4).

[17] 17 C.F.R. §§ 201.230, 201.233.

[18] *Id.* § 556(c)(3); 17 C.F.R. § 200.14(a)(3).

[19] 17 C.F.R. § 201.111(c).

[20] 5 U.S.C. § 556(c)(9); 17 C.F.R. §§ 200.14(a)(3), (7), 201.111(h), 201.220, 201.250.

[21] 5 U.S.C. § 556(c)(2); 17 C.F.R. §§ 200.14(a)(2), 201.111(b).

hearings, SEC ALJs make credibility findings to which the SEC affords "considerable weight" during agency review.[23]

They also have authority to issue initial decisions that declare respondents liable and impose sanctions.[24] When a respondent does not timely seek agency review, "the action of [the ALJ] shall, for all purposes, including appeal or review thereof, be deemed the action of the Commission."[25] Even when a respondent timely seeks agency review,

_____

Cont.

[22] 5 U.S.C. § 556(b); 17 C.F.R. § 200.14(a).

[23] SEC Release No. 9972, 2015 WL 6575665, at *15 n.83 (deferring to SEC ALJ's credibility findings in the face of conflicting testimony). The dissent argues STJs exercise "significant authority" because the Tax Court was "'required to defer' to the [STJs'] factual and credibility findings 'unless they were clearly erroneous,'" Dissent at 3 (quoting *Landry*, 204 F.3d at 1133). But SEC ALJs' credibility findings also receive deference. The SEC affords their credibility findings "considerable weight and deference," Thomas C. Bridge, SEC Release No. 9068, 2009 WL 3100582, at *18 n.75 (Sept. 29, 2009), and accepts the findings "absent substantial evidence to the contrary," Steven Altman, SEC Release No. 63306, 2010 WL 5092725, at *10 (Nov. 10, 2010). *See also* Robert Thomas Clawson, SEC Release No. 48143, 2003 WL 21539920, at *2 (July 9, 2003) (stating the SEC "accepts" the ALJs' credibility findings "absent overwhelming evidence to the contrary"). Both the Tax Court and the SEC defer to credibility findings but are not required to accept those findings if they are undermined by other evidence. Thus, SEC ALJs, like STJs, exercise significant authority in part because the SEC defers to their credibility findings.

[24] 5 U.S.C. § 556(c)(10); 17 C.F.R. §§ 200.14(a)(8), 200.30-9(a), 201.111(i), 201.360; *see also* SEC Release No. 507, 2013 WL 5553898.

[25] 15 U.S.C. § 78d-1(c). The SEC and the dissent argue the SEC ALJs do not exercise significant authority when issuing initial decisions because the agency retains a right to review the decisions de novo. But this argument is incomplete. The agency has discretion to engage in de novo review, 15 U.S.C. § 78d-1(b), but also has discretion not

Continued . . .

the agency may decline to review initial decisions adjudicating certain categories of cases.[26]

Further, SEC ALJs have power to enter default judgments[27] and otherwise steer the outcome of proceedings by holding and requiring attendance at settlement conferences.[28] They also have authority to set aside, make permanent, limit, or suspend temporary sanctions that the SEC itself has imposed.[29]

_____

Cont.

to engage in de novo review before an initial decision becomes final, 17 C.F.R. § 201.360(d)(2) (stating the agency can make an initial decision final by entering an order). In fact, the agency has no duty, based on the regulation's plain language, to review an unchallenged initial decision before entering an order stating the decision is final. 17 C.F.R. § 201.360(d)(2). Thus, SEC ALJs exercise significant authority in part because their initial decisions can and do become final without plenary agency review. Indeed, 90 percent of those initial decisions become final without plenary review. SEC, ALJ Initial Decisions, https://www.sec.gov/alj/aljdec.shtml (archiving initial decisions); *see also* Amici Br. at 13-14.

Further, an SEC ALJ's authority to issue an initial decision is significant because, even if reviewed de novo, the ALJ plays a significant role as detailed above in conducting proceedings and developing the record leading to the decision, and the decision publicly states whether respondents have violated securities laws and imposes penalties for violations. *Id.* § 201.360(c) (requiring the agency to publish the initial decision on the SEC docket).

[26] 17 C.F.R. § 201.411(b)(2).

[27] 17 C.F.R. § 201.155.

[28] 5 U.S.C. § 556(c)(6), (8); 17 C.F.R. § 201.111(e).

[29] 17 C.F.R. §§ 200.30-9, 201.531; *see also* 15 U.S.C. § 78u-3(c) (describing temporary order); 17 C.F.R. § 201.101(a)(11) (stating a temporary sanction is "a temporary cease-and-desist order or a temporary suspension of . . . registration"); *id.*

Continued . . .

- 21 -

In sum, SEC ALJs closely resemble the STJs described in *Freytag*. Both occupy offices established by law; both have duties, salaries, and means of appointment specified by statute; and both exercise significant discretion while performing "important functions" that are "more than ministerial tasks." *Freytag*, 501 U.S. at 881-82; *see also Samuels*, 930 F.2d at 986. Further, both perform similar adjudicative functions as set out above.[30] We therefore hold that the SEC ALJs are inferior officers who must be appointed in conformity with the Appointments Clause.[31]

_____

Cont.

§§ 201.510(b), 201.512(a), 201.521(b), 201.522(a) (describing a temporary sanction and stating an SEC commissioner presides over the hearing and that the agency must issue the order); *id.* § 201.531(a)(1) (stating an initial decision "shall specify" which terms or conditions of a temporary sanction "shall become permanent"); *id.* § 201.531(a)(2) (stating an initial decision "shall specify" "whether a temporary suspension of a respondent's registration, if any, shall be made permanent"); *id.* § 201.531(b) (stating an order modifying a temporary sanction "*shall be effective* 14 days after service" (emphasis added)).

[30] The dissent complains that the majority opinion "lists the duties of SEC ALJs, without telling us which, if any, were more important to its decision than others and why." Dissent at 11. But this misses the point of our following *Freytag*. There, the Court identified four duties that supported the STJs' inferior officer status: "They take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." 501 U.S. at 881-82. We point out above that SEC ALJs perform comparable duties, and we spell out even more of their discretionary functions.

[31] Those who challenge agency action typically have the burden to show prejudicial error. 5 U.S.C. § 706; *Shinseki v. Sanders*, 556 U.S. 396, 406-07 (2009). The error here is structural because the Supreme Court has recognized the separation of powers as a "structural safeguard." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995) (emphasis omitted). Structural errors are not subject to prejudicial-error review.

Continued . . .

- 22 -

This holding serves the purposes of the Appointments Clause. The current ALJ hiring process whereby the OPM screens applicants, proposes three finalists to the SEC, and then leaves it to somebody at the agency to pick one, is a diffuse process that does not lend itself to the accountability that the Appointments Clause was written to secure. In other words, it is unclear where the appointment buck stops. The current hiring system would suffice under the Constitution if SEC ALJs were employees, but we hold under *Freytag* that they are inferior officers who must be appointed as the Constitution commands. As the Supreme Court said in *Freytag*, "The Appointments Clause prevents Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint." 501 U.S. at 880.

### F. *The SEC's Arguments*

### 1. Final Decision-Making Power

In rejecting Mr. Bandimere's Appointments Clause argument during agency review, the SEC's opinion concluded the ALJs are not inferior officers because they

_____

Cont.

*See Rivera v. Illinois*, 556 U.S. 148, 161 (2009) (stating "constitutional errors concerning the qualification of the jury or judge" require automatic reversal (emphasis omitted)); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 123 (D.C. Cir. 2015) ("[A]n Appointments Clause violation is a structural error that warrants reversal regardless of whether prejudice can be shown."); *United States v. Solon*, 596 F.3d 1206, 1211 (10th Cir. 2010) (stating structural errors are subject to automatic reversal).

Mr. Bandimere argues, "[The SEC ALJ] is an inferior officer whose unconstitutional appointment is a structural constitutional error that invalidates the proceeding." Aplt. Br. at 18. The SEC does not dispute that an Appointments Clause error here is structural and that there is no need to show prejudice.

- 23 -

cannot render final decisions and the agency retains authority to review ALJs' decisions de novo.

The SEC makes similar arguments here. It contends the *Freytag* Court relied on the STJs' final decision-making power when it held they were inferior officers. The agency draws on *Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000), in which the D.C. Circuit attempted to distinguish *Freytag* and held that FDIC ALJs were employees. 204 F.3d at 1134. In *Landry*, the D.C. Circuit stated *Freytag* "laid exceptional stress on the STJs' final decisionmaking power." *Id.* The court therefore considered dispositive the FDIC ALJs' inability to render final decisions. *Id.*

This past August, the D.C. Circuit addressed the same question we face here. *Raymond J. Lucia Cos., Inc. v. SEC*, 832 F.3d 277, 283 (D.C. Cir. 2016). The D.C. Circuit followed *Landry* and concluded that SEC ALJs are employees and not inferior officers. *Id.* at 283-89. The holding was based on the court's conclusion that SEC ALJs cannot render final decisions. *Id.* at 285 ("[T]he parties principally disagree about whether [SEC] ALJs issue final decisions of the [SEC]. Our analysis begins, and ends, there."). We disagree with the SEC's reading of *Freytag* and its argument that final decision-making power is dispositive to the question at hand.

First, both the agency and *Landry* place undue weight on final decision-making authority. *Freytag* stated the government's argument that STJs should be deemed employees when they lacked the ability to enter final decisions "ignore[d] the significance of the duties and discretion that [STJs] possess." 501 U.S. at 881. The

Supreme Court held STJs are inferior officers because their office was established by law; their duties, salaries and means of appointments were "specified by statute"; and they "exercise[d] significant discretion" in "carrying out . . . important functions." *Id.* at 881-82.

Moreover, *Freytag* agreed with the Second Circuit's *Samuels* decision, *id.*, which held that STJs are inferior officers because they "exercise a great deal of discretion and perform important functions" in § 7443A(b)(4) cases, *Samuels*, 930 F.2d at 986. The Second Circuit did not rely on the STJs' ability to enter final decisions under § 7443A(b)(1), (2), and (3). *Id.* at 985-86. Rather, it said STJs are inferior officers even though "the ultimate decisional authority in cases under section 7443A(b)(4) rests with the Tax Court judges." *Id.* at 985. Like *Freytag*, *Samuels* hinged on the STJs' duties and not on final decision-making power.

After stating its holding that STJs are inferior officers based on their duties, the *Freytag* Court responded to the government's standing argument. 501 U.S. at 882. The Court stated, "*Even if* the duties of special trial judges under subsection (b)(4) were not as significant as we and the two courts have found them to be, our conclusion would be unchanged." *Id.* (emphasis added). This sentence reaffirms what the Court previously concluded: it "found" the duties of the STJs are sufficiently significant to make them inferior officers. *Id.* That conclusion did not depend on the STJs' authority to make final

- 25 -

decisions.[32]

Further, the Court's "even if" argument was a response to (1) the government's concession that STJs are inferior officers in § 7443A(b)(1), (2), and (3) cases, where they had final decision-making authority,[33] and (2) the government's argument that the petitioners lacked standing to rely on the STJs' authority in those types of cases to establish the STJs' inferior officer status in § 7443A(b)(4) cases.[34] Based on the

---

[32] Judge Randolph rebutted the *Landry* majority by arguing the following:

> The [*Freytag*] Court introduced its alternative holding thus: "Even if the duties of special trial judges [just described] were not as significant as we and the two courts have found them to be, our *conclusion* would be unchanged." 501 U.S. at 882 (italics added). What "conclusion" did the Court have in mind? The conclusion it had reached in the preceding paragraphs—namely, that although special trial judges may not render final decisions, they are nevertheless inferior officers of the United States within the meaning of Article II, § 2, cl. 2. The same conclusion, the same holding, had also been rendered in [*Samuels*], a decision the Supreme Court cited and expressly approved. *See* 501 U.S. at 881. There the Second Circuit held that a special trial judge performing the same advisory function as the judge in *Freytag* was an inferior officer; the court of appeals did not mention the fact that in other types of cases, the judge could issue final judgments.

*Landry*, 204 F.3d at 1142 (Randolph, J., concurring).

[33] "The Commissioner concedes that in cases governed by subsections (b)(1), (2), and (3), special trial judges act as inferior officers who exercise independent authority." 501 U.S. at 882.

[34] "But the Commissioner urges that petitioners may not rely on the extensive power wielded by the [STJ] in declaratory judgment proceedings and limited-amount tax cases because petitioners lack standing to assert the rights of taxpayers whose cases are assigned to [STJs] under subsections (b)(1), (2), and (3)." *Id.*

Continued . . .

government's concession, the Court stated STJs could not transform to employees by "perform[ing] duties that may be performed by an employee not subject to the Appointments Clause." *Id.* The Court thus rejected the standing argument as "beside the point." *Id.*

The Court's rejection of the government's standing argument is a far cry from holding that final decision-making authority is the predicate for inferior officer status. Indeed, the Court did not hold that STJs are inferior officers because they have final decision-making authority in § 7443A(b)(1), (2), and (3) cases. Rather, it accepted the government's concession that STJs are inferior officers in those cases for the purpose of responding to the standing argument. Thus, the Court's "even if" argument did not modify or supplant its holding that STJs were inferior officers based on the "significance of [their] duties and discretion." *Id.* at 881.

The SEC reads *Freytag* as elevating final decision-making authority to the crux of inferior officer status. But properly read, *Freytag* did not place "exceptional stress" on final decision-making power.[35] To the contrary, it rebutted the government's argument that STJs were inferior officers when they lacked final decision-making power (i.e.,

_____
Cont.

[35] *Compare Freytag*, 501 U.S. at 881-82 (rejecting the government's argument that STJs were employees when they lacked final decision-making power), *with Landry*, 204 F.3d at 1134 (asserting *Freytag* "laid exceptional stress on the STJs' final decisionmaking power").

§ 7443A(b)(4) cases) because the argument "ignore[d] the significance of the duties and discretion that [STJs] possess." *Freytag*, 501 U.S. at 881.

Final decision-making power is relevant in determining whether a public servant exercises significant authority. But that does not mean *every* inferior officer *must* possess final decision-making power. *Freytag*'s holding undermines that contention. In short, the Court did not make final decision-making power the essence of inferior officer status. Nor do we.

Second, the SEC's argument finds no support in other Supreme Court decisions describing inferior officers. In *Edmond*, the Supreme Court considered final decision-making power as relevant to the difference between a principal and inferior officer, not the difference between an officer and an employee. 520 U.S. at 665. The Court held Coast Guard Court of Criminal Appeals judges were inferior officers instead of principal officers because they "ha[d] no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers, and hence they [were] inferior within the meaning of Article II." *Id.* In other words, the Court classified the judges as inferior officers even though they had no final decision-making power. *Id.*

In *Buckley*, the Court held FEC commissioners were inferior officers because they exercised "significant authority," including the "responsibility for conducting civil litigation in the courts of the United States for vindicating public rights." 424 U.S. at 125-26, 140. The *Buckley* Court analyzed significant authority as a matter of degree without discussing final decision-making power. *Id.*; *see also Ass'n of Am. Railroads v.*

*U.S. Dep't of Transp.*, 821 F.3d 19, 38 (D.C. Cir. 2016) (stating *Edmond* "clarified [that] the degree of an individual's authority is relevant in marking the line between officer and nonofficer, not between principal and inferior officer" (citing *Edmond*, 520 U.S. at 662)).

The Court has not equated significant authority with final decision-making power in *Buckley*, *Freytag*, *Edmond*, or elsewhere. Nor has it indicated that each of the officers it has deemed inferior possesses that power.[36] Further, Justice Breyer has stated that "efforts to define ['inferior Officer'] inevitably conclude that the term's sweep is unusually broad." *Free Enter. Fund*, 561 U.S. at 539 (Breyer, J., dissenting).

Third, supervision by superior officers is not unique to employees. It is a common feature of inferior officers as well.[37] The military judges at issue in *Edmond* were inferior

––––––––––––––––––

[36] Whether SEC ALJs can enter final decisions is not dispositive to our holding because it was not dispositive to *Freytag*'s holding. Nevertheless, the SEC's argument that its ALJs can never enter final decisions is not airtight. Without a timely petition for review, SEC ALJ's actions are "deemed the action of the Commission." 15 U.S.C. § 78d-1(c). The agency retains authority to review initial decisions de novo and may determine the date on which an unchallenged initial decision is final. 15 U.S.C. § 78d-1(b); 17 C.F.R. § 201.360(d)(2); *Lucia*, 832 F.3d at 286-87. But the agency may simply enter an order stating an initial decision is final without engaging in any review. 17 C.F.R. § 201.360(d)(2). And the agency can also decline to review an initial decision even when there is a timely petition for review. 17 C.F.R. § 201.411(b)(2). Thus, the Exchange Act and the agency's regulations provide a path for an initial decision to become final without plenary agency review. In practice, most initial decisions follow that path—90 percent. *See* SEC, ALJ Initial Decisions, https://www.sec.gov/alj/aljdec .shtml.

[37] *Edmond*, 520 U.S. at 663 (stating an inferior officer is "directed and supervised at some level by others who were appointed by Presidential nomination with advice and consent of the Senate"); *Landry*, 204 F.3d at 1142 (Randolph, J., concurring) ("The fact that an ALJ cannot render a final decision and is subject to the ultimate supervision of the

Continued . . .

- 29 -

officers based on their inability to "render a final decision . . . unless permitted to do so by other Executive officers." 520 U.S. at 665. Thus, the fact that the SEC can reverse its ALJs does not mean they are employees rather than inferior officers.

## 2. **Deference to Congress**

The SEC further contends Congress intended its ALJs to be employees. It urges us to "accor[d] significant weight" to congressional intent in determining whether the ALJs are inferior officers. Aplee. Br. at 41.

The SEC overstates its arguments. In its brief, it has not cited statutory language expressly stating ALJs are employees for purposes of the Appointments Clause. Nor has it cited legislative history indicating Congress has specifically addressed the question whether ALJs are inferior officers. And to the extent the SEC seeks to infer congressional intent from congressional action, the evidence is mixed.

On the one hand, the SEC stresses that Congress was "deliberate" in constructing the statutory framework governing the hiring of ALJs and the powers ALJs have in relation to their agencies. Aplee. Br. at 27. This includes placing the position within the civil service and tasking the OPM to prescribe rules governing ALJ hiring. 5 U.S.C. §§ 1302, 3105, 3313; 5 C.F.R. § 930.201. The SEC argues this suggests congressional intent to classify ALJs as employees. But, on the other hand, and as detailed previously,

_____

Cont.

FDIC shows only that the ALJ shares the common characteristic of an 'inferior Officer.'").

- 30 -

Congress granted significant authority to SEC ALJs in the APA and the Exchange Act and has authorized the agency to delegate "any of its [non-rulemaking] functions" to ALJs. 5 U.S.C. §§ 556, 557; 15 U.S.C. § 78d-1(a).

When it has faced a case or controversy concerning separation of powers, the Supreme Court has determined whether the legislative or executive branches or both have violated the Constitution. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714 (1986); *INS v. Chadha*, 462 U.S. 919 (1983); *Buckley*, 424 U.S. at 1; *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). This has been so even when a congressional scheme was carefully devised and effective. *Bowsher*, 478 U.S. at 736.[38] However "carefully devised" the ALJ system may be generally and the SEC ALJ program particularly, *see Lucia*, 832 F.3d at 289, that should not excuse failure to comply with the Appointments Clause. As a circuit court, we must follow Supreme Court precedent. *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam) ("[A] precedent of [the Supreme] Court must be followed by the lower federal courts."). And as explained, *Freytag* governs our result here.

---

[38] In *Bowsher*, the Court stated:

> No one can doubt that Congress and the President are confronted with fiscal and economic problems of unprecedented magnitude, but "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government."

478 U.S. at 736 (ellipsis omitted) (quoting *Chadha*, 462 U.S. at 944).

Moreover, the Supreme Court's treatment of the government's deference argument in *Freytag* is instructive here. The government contended the Supreme Court should "defer to the Executive Branch's decision that there has been no legislative encroachment on Presidential prerogatives under the Appointments Clause." 501 U.S. at 879. The Court rejected that argument: "[T]he Clause forbids Congress to grant the appointment power to inappropriate members of the Executive Branch. Neither Congress nor the Executive can agree to waive this structural protection. . . . The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic." *Id.* at 880; *see also NLRB v. Noel Canning*, 134 S. Ct. 2550, 2594 (2014) (Scalia, J., concurring in the judgment) ("[T]he political branches cannot by agreement alter the constitutional structure."). As stated, we question whether Congress has clearly classified SEC ALJs as employees. But even if it had, we would still follow *Freytag*.

## G. *The Dissent's Arguments*

We address three of the dissent's main arguments. First, it points out the STJs had "power to bind the Government and third parties," and the "SEC ALJs do not." Dissent at 1. This is the final authority argument the SEC makes here and that the D.C. Circuit relied on in *Landry* and *Lucia*. We have addressed this argument above.

Second, the dissent contends that "even where [STJs] could not enter final decisions, their initial decisions had binding effect." *Id.* at 2. The SEC did not make this argument. In any event, the contention is incorrect because it rests on a misapprehension

- 32 -

of the Tax Court judges' and STJs' roles in cases where the Tax Court judges must make the final decisions, such as *Freytag*. *See Ballard v. Comm'r of Internal Revenue*, 544 U.S. 40, 44 (2005) (citing 26 U.S.C. § 7443A(c)) (stating Tax Court judges must make the "[u]ltimate decision in cases involving tax deficiencies that exceed $50,000"). The dissent asserts that the STJs in effect made the final decisions in those cases because the Tax Court "purported to adopt its [STJs'] opinions verbatim in 880 out of 880 cases between 1983 and 2005." Dissent at 8. At first blush, that assertion suggests the Tax Court rubber stamped 880 STJ recommendations without making a single change. But a full reading of the dissent's cited sources shows that assertion is incorrect.

In *Ballard*, a case the dissent mistakenly relies on to attempt to differentiate STJs and SEC ALJs,[39] the Supreme Court described the Tax Court's process of reviewing STJ's recommendations based on the government's own explanation of how Tax Court judges and STJs worked together. 544 U.S. at 58, 65 (stating the government "describe[d] and defend[ed]" its process). Beginning in 1983, STJs submitted "reports" to the Tax Court judges tasked with making the final decision in each particular case. *Id.* at 58. In each case, the Tax Court judge treated the report as an "in-house draft" and engaged in a "collaborative process" with the STJ in which they "worked over" the report

---

[39] The dissent relies on *Ballard*, Dissent at 2-4, yet objects to our use of the case to rebut its argument that the Tax Court deferred to STJs on questions of law. *Id.* at 5 n.1. We do not rely on *Ballard* in reaching our holding or in responding to the SEC's arguments (because the SEC did not rely on it). We discuss the case only to respond to the dissent.

and produced an "opinion of the [STJ]." *Id*. at 57. "When the collaborative process [was] complete, the Tax Court judge issue[d] a decision in all cases agreeing with and adopting the opinion of the [STJ]." *Id.* (alterations and quotations omitted). In sum, the Tax Court judges adopted opinions they had a hand in supervising and producing.

The law review article the dissent cites explains why it is simply not true that the Tax Court rubber stamped 880 of 880 STJ opinions: "the Tax Court judge treated the report and recommendation of the [STJ] as a draft of an opinion that would, after a collaborative effort with the Tax Court judge, ultimately be adopted by the Tax Court." Christopher M. Pietruszkiewicz, *Conflating Standards of Review in the Tax Court: A Lesson in Ambiguity*, 44 Hous. L. Rev. 1337, 1360 (2008). The dissent's conclusion that the STJs' "initial report often decided the case," Dissent at 3, overstates the STJs' role. And their actual role hardly supports the notions that Tax Court judges "appeared to defer to its [STJs] on conclusions of law" or "that [the STJs] had as much authority as Tax Court judges themselves." *Id.* at 3, 6.[40] Even if the Tax Court did not review STJs'

---

[40] The dissent states the Tax Court judge in *Freytag* adopted the STJ's report "verbatim." Dissent at 5 n.1. There is no indication that is true. By the time of the *Freytag* trial in 1987, the Tax Court had been practicing the "collaborative process" described above for four years. *See Ballard*, 544 U.S. at 57 (stating the Tax Court began the "collaborative process" in 1983). The Tax Court judge in *Freytag* received the STJ's "*report*" and within four months adopted the STJ's "*opinion*," *Freytag*, 501 U.S. at 872 n.2 (emphasis added), which, as we learn from *Ballard*, is the document produced by the STJ *and* the Tax Court judge collaboratively, *Ballard*, 544 U.S. at 58.

In other words, *Freytag* appears to be an example of the collaborative process at work—the STJ provided the Tax Court judge a "report," and the Tax Court judge later adopted the STJ's "opinion" that resulted from the joint efforts of the STJ and Tax Court

Continued . . .

recommendations in most cases, that would not distinguish STJs from SEC ALJs. Most of the SEC ALJs' initial decisions—about 90 percent—become final without any review or revision from an SEC Commissioner.[41]

The dissent is left with its argument that in certain cases the STJs "had the power to bind third parties and the government itself." *Id.* at 6 n.2. But, as previously explained, *Freytag* did not regard this ground as dispositive to hold the STJs are inferior officers.[42]

Moreover, even if the STJs exercise more authority than the SEC ALJs, it does not follow that the former are inferior officers and the latter are employees or that the latter do not exercise significant authority. We agree that ALJs are not identical to STJs. But,

_____

Cont.

judge. Nevertheless, the dissent infers the Tax Court judge adopted the STJ's recommendation "verbatim," Dissent at 5 n.1, even though the Supreme Court declined "to assume 'rubber stamp' activity on the part of the [Tax Court judge]," *Freytag*, 501 U.S. at 872 n.2.

[41] Amici report and the agency does not dispute that approximately 90 percent of SEC ALJs' initial decisions issued in 2014 and 2015 became final without agency plenary review. Amici Br. at 13-14. Our review of the SEC's archives confirms this information. *See* SEC, ALJ Initial Decisions, https://www.sec.gov/alj/aljdec.shtml.

[42] The dissent does not state it disagrees with our reading of *Freytag*. Rather, it relies on passages from the petitioners' brief in *Freytag* to describe the characteristics of the STJs. What really counts, however, are the STJs' features the Supreme Court relied on to determine they are inferior officers. The *Freytag* opinion—not one side's advocacy brief—is the proper source for analysis. And, as our analysis shows, *Freytag* leads us to conclude the SEC ALJs are inferior officers.

as explained in detail above, STJs and ALJs closely resemble one another where it counts. SEC ALJs can still be inferior officers without possessing identical powers as STJs, just like STJs can still be inferior officers without possessing identical powers as FEC commissioners and assistant surgeons. *See Buckley*, 424 U.S. at 125-26; *Moore*, 95 U.S. at 762.[43]

Third, the dissent expresses concerns about "the probable consequences of today's decision." Dissent at 11. It goes on to raise issues that are not before us and that the parties did not brief.

We recognize that our holding potentially implicates other questions. But no other issues have been presented to us here, and we therefore cannot address them. Nothing in this opinion should be read to answer any but the precise question before this court: whether SEC ALJs are employees or inferior officers. Questions about officer removal, officer status of other agencies' ALJs, civil service protection, rulemaking, and retroactivity, *see* Dissent at 11-15, are not issues on appeal and have not been briefed by the parties. Having answered the question before us, and thus resolved Mr. Bandimere's petition, we must leave for another day any other putative consequences of that conclusion.

---

[43] The dissent does not explain or even acknowledge the differences between inferior and principal officers. Nor does it recognize that inferior officers are subordinates who are still considered officers even when a superior officer directs their actions or makes final decisions.

## III. **CONCLUSION**

SEC ALJs "are more than mere aids" to the agency.  *Samuels*, 930 F.2d at 986.

They "perform more than ministerial tasks."  *Freytag*, 501 U.S. at 881.  The governing

statutes and regulations give them duties comparable to the STJs' duties described in

*Freytag*.  SEC ALJs carry out "important functions," *id.* at 882, and "exercis[e]

significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126.

The SEC's power to review its ALJs does not transform them into lesser functionaries.

Rather, it shows the ALJs are inferior officers subordinate to the SEC commissioners.

*Edmond*, 520 U.S. at 663.

The SEC ALJ held his office unconstitutionally when he presided over Mr.

Bandimere's hearing.  We grant the petition for review and set aside the SEC's opinion.

**No. 15-9586, <u>Bandimere v. SEC</u>**

**BRISCOE**, Circuit Judge, concurring.

I write not to differ with the rationale of the majority opinion, but rather to fully join it. My focus here is on the dissent. I group my concerns in two categories: (I) the dissent's predictions about speculative "repercussions" of the opinion, by which it reaches what appear to be several erroneous conclusions; and (II) its application of a truncated legal framework to a misstated version of the facts of record.

I

Underlying the dissent's position is a concern about the next case, and the one after that. The dissent suggests that a "probable consequence[]" of the opinion is that "all" 1,792 "federal ALJs are at risk of being declared inferior Officers." Dissent at 11 & n.5. But this was no less true when <u>Freytag v. Commissioner of Internal Revenue</u> was decided. 501 U.S. 868 (1991). A "risk" always exists that a court will be called on to decide whether *any* particular federal employee or group of employees has been delegated sufficient authority to fall within the ambit of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, the Constitution's structural safeguard tethering key personnel—Officers—to the sovereign power of the United States, and thus to the people. Answering that question in the affirmative as to the SEC's five ALJs does no "mischief" to bedrock principles of constitutional law. Dissent at 16.

Further, the majority has not affected "thousands of administrative actions," <u>id.</u> at 11, by answering that question. <u>Freytag</u> instead commands that courts engage in a case-by-case analysis. 501 U.S. at 880–82. Specifically, a court must determine whether a federal employee (or class of employees) is subject to the Appointments Clause by

1

answering whether the employee exercises "significant authority pursuant to the laws of the United States," and, in turn, by analyzing the aggregate "duties and functions" the employee performs or is authorized to perform. <u>Id.</u> at 881 (quotation marks and citations omitted). That power sometimes comes in the form of final decision-making authority, <u>id.</u> at 882; other times, not. <u>Id.</u> at 881–82. The majority merely and correctly applies <u>Freytag</u>'s test to answer that question as to the SEC's five ALJs.

Relatedly, the dissent errs when it suggests that the majority is operating without "much precedent." Dissent at 16. The majority simply applies <u>Freytag</u>'s framework, as all lower courts must do. In truth, the dissent takes issue with and devotes much of its analysis to suggesting that the majority ought to follow the D.C. Circuit's *misapplication* of <u>Freytag</u> wrought in <u>Landry v. FDIC</u>, 204 F.3d 1125 (D.C. Cir. 2000), and bolstered by <u>Raymond J. Lucia Cos., Inc. v. Securities and Exchange Commission</u>, 832 F.3d 277 (D.C. Cir. 2016). The critical difference between the majority and <u>Landry</u> and <u>Lucia</u> is that the majority recognizes that <u>Freytag</u> does *not* make final decision-making authority the *sine qua non* of inferior Officer status. 501 U.S. at 881–82.

The D.C. Circuit erroneously suggested as much in <u>Landry</u> when it said, over Judge Randolph's contrary view, that the <u>Freytag</u> Court saw final decision-making authority as "exceptional[ly]" important and "critical" to determining Officer status. 204 F.3d at 1134. And <u>Lucia</u> compounded that error when it acknowledged that the parties identified (as here) other powers the SEC's ALJs exercise but then narrowed its analysis to and rested its holding entirely on whether those ALJs can issue final decisions for the SEC. <u>See</u> 832 F.3d at 285 (acknowledging that "the parties principally," not only, "disagree[d] about whether" the SEC's "ALJs issue final decisions of the" SEC and explaining that the

2

court's "analysis begins, and ends," with that question); id. at 285–89 (analyzing only whether the SEC's ALJs can render final decisions). The majority applies precedent: Freytag, not Landry or Lucia.

The dissent also contends that the majority's opinion "will be used to strip all ALJs of their dual layer for-cause protection." Dissent at 14. This troubling statement calls for a response because the dissent essentially predetermines the holdings of hypothetical cases not before this court.

In some future case, a litigant may argue that all ALJs are inferior Officers. But as the majority here explains—and Freytag commands—whether a particular federal employee or class of employees are Officers subject to the Appointments Clause requires a position-by-position analysis of the authority Congress by law and a particular executive agency by rule and practice has delegated to its personnel. 501 U.S. at 881–82. Some ALJs within particular agencies may exercise so little authority and also be subject to such complete oversight (e.g., unlike here, de novo review) that they are not Officers. The majority rightly does not attempt to answer whether each ALJ in every federal agency is an Officer because Freytag disclaims such sweeping pronouncements, id., and, in any event, it is not necessary to do so to resolve Mr. Bandimere's appeal.

The dissent also does not stop after incorrectly stating that the majority has addressed an issue not before us. It instead goes on to suggest that the majority's non-answer to an unasked question may lead to the implosion of the federal civil service, at least as to all federal ALJs. But the dissent is wrong as to the outcome of such a hypothetical future case. And in suggesting that this outcome follows from the majority's opinion, the dissent unnecessarily sounds alarms which demand rejoinder.

3

Specifically, the dissent worries that the consequence of the majority's opinion is that all federal ALJs are inferior Officers, that all federal ALJs are thus afforded the double-for-good-cause-removal protection forbidden by Free Enterprise Fund v. PCAOB, 561 U.S. 477 (2010), and that, as a result, all federal ALJs will lose their civil service protections. Warning of the dangers of such a conclusion, the dissent suggests that the Social Security Administration will be impaired when its 1,537 ALJs lose their civil service protections. But there are at least two errors in the dissent's speculation about facts not before this court.

First, it may well be that within the Social Security Administration ALJs are removable in a manner that does not run afoul of Free Enterprise Fund. For example, if the person or persons responsible for firing those ALJs are not afforded good-cause removal protections, then the Administration's ALJs will retain their civil service protections even if they are inferior Officers. The dissent cannot say for certain whether this is so, because we have no briefing on the subject in this case, which deals only with the SEC.

Second, even assuming that *all* federal ALJs are Officers who are removable only for good cause and that they are *all* selected by Officers who are also removable only for good cause, the dissent knocks down a straw man by suggesting that Free Enterprise Fund might require stripping all ALJs of their civil service protections. Rather, as Free Enterprise Fund reminds us, courts normally are required to afford the *minimum* relief necessary to bring administrative overreach in line with the Constitution:

> Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, severing any problematic portions while leaving the remainder intact. Because the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining

4

provisions, the normal rule is that partial, rather than facial, invalidation is the required course. . . . Concluding that the removal restrictions are invalid leaves [an Officer] removable . . . at will, and leaves the President separated from [the Officer] by only a single level of good-cause tenure.

Id. at 508–09 (quotation marks, alterations, and citations omitted).

The D.C. Circuit just recently employed this principle in PHH Corp. v. Consumer Financial Protection Bureau, 839 F.3d 1 (D.C. Cir. 2016). There, the court held, *inter alia*, that the Consumer Financial Protection Bureau (CFPB) was so structured as to violate Article II because it was headed by a single director who was removable only for good cause. Id. at 12–39. But the remedy for this unconstitutional structure was not—as the petitioners had urged—the abrogation of the CFPB. Id. at 37. Applying Free Enterprise Fund and other Supreme Court precedents, the D.C. Circuit instead struck the single offending clause from the CFPB's implementing legislation and rendered the director removable by the President at will, rather than for good cause. Id. at 37–39.

Thus, contrary to the dissent's suggestions, the majority's opinion portends no change to any ALJ's robust protections. The dissent states that all *1,792* federal ALJs are removable only by the United States Merit Systems Protect Board (MSPB), "and only for good cause." Dissent at 14. Assuming *arguendo* that is always correct, see 5 U.S.C. § 7521, cursory research on this un-briefed issue reveals that the MSPB is composed of *three* members, each of whom are appointed directly by the President but removable only for good cause. 5 C.F.R. § 1200.2. So even if this court were faced with the hypothetical future case that troubles the dissent, there is no cause for alarm that the administrative state will be eroded (and of course, that is of no import to whether the government is following Article II). See Free Enterprise Fund, 561 U.S. at 499. A court faced with such a challenge would be empowered only to order the minimal remedy effective to cure the

5

Article II error, id. at 508–10: rendering the MSPB's three members removable by the President at will.  While the dissent opines on the hypothetical consequences of the majority's opinion, today's decision will have *none* of the consequences to the nationwide civil service that the dissent predicts.

Additionally, the dissent is incorrect when it argues that the majority is not showing appropriate "deference to Congress," Dissent at 16, on this structural constitutional question, as when it states: "Whether federal ALJs should receive such dual for-cause protections is perhaps a question that could be debated, but Congress has already decided this question in favor of protecting ALJs . . . ."  Id. at 14 n.8.  Freytag rejected this exact argument and recognized that "[t]he structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic."  501 U.S. at 880.  With respect to removal specifically, even if Congress sought to insulate all federal ALJs from Executive control by placing them behind double layers of good-cause removal protection, Free Enterprise Fund holds that a court would be obliged to afford that decision *no* deference and instead to strike the unsound architecture.  561 U.S. at 497.

In any event, the dissent's dire predictions about hypothetical consequences of the majority's holding are exaggerated.

## II

Turning to the dissent's proposal for deciding this case on the facts here, the dissent appears to *sub silentio* urge this court to adopt Landry and Lucia's misstatement of Freytag's test for determining whether a federal employee is an inferior Officer.  That is, the dissent focuses almost exclusively on whether the SEC's ALJs exercise final decision-making authority, calling it the "[m]ost important[]" consideration that "makes all the

6

difference" in deciding whether the ALJs are Officers. Dissent at 1 (citing, *inter alia*, Lucia, 832 F.3d at 285–87); see id. at 6 n.2 (arguing that "[d]elegated sovereign authority has long been understood to be a key characteristic of a federal 'office'"); id. at 7–8 (contending, absent citation to authority, that this question "is not about" the SEC's delegation to its ALJs of "day-to-day discretion" because "the Appointments Clause does not care about *that*").

But as the majority points out, this mode of analysis—and the D.C. Circuit's repeated application of it—is wrong. Freytag instead compels courts, as the majority does here, to examine all of the "duties and functions" a federal employee has been delegated and then to determine whether that person is exercising the authority of the United States (an Officer) or simply carrying out "ministerial" government tasks (an employee). 501 U.S. at 881–82. Here, the distinction is exemplified by whether the government employee in question was engaged in the ministerial task of transcribing the record at Mr. Bandimere's hearing or was the person who decided on behalf of the United States that his testimony there was not believable and in what respects, critical issues to determining whether he ought to incur civil penalties. See id.

Likewise, final decision-making authority is but one sovereign power, albeit an important one that is typically *sufficient* to render an employee an Officer. See, e.g., id. at 882. Though final decision-making authority might be *sufficient* to make an employee an Officer, that does not mean such authority is *necessary* for an employee to be an Officer, contrary to the dissent's suggestion and Lucia's holding—by its refusal to consider any of the SEC's ALJs' other duties and functions. 832 F.3d at 285. Conducting the correct, nuanced analysis of the powers Congress by statute and the SEC by rule and practice have afforded its ALJs, the majority correctly reasons that the SEC's ALJs exercise significant

authority and are thus inferior Officers, subject to the Appointments Clause. The dissent therefore errs—as do <u>Landry</u> and <u>Lucia</u>—by applying a truncated version of <u>Freytag</u>'s legal framework.

Further, even as to its analysis of the SEC's ALJs' decision-making authority, the dissent mischaracterizes the factual record in a manner that it is imperative to correct. Specifically, the dissent states and then repeatedly relies on the fact that the SEC is not required to afford its ALJs any deference and that it conducts de novo review of their decisions to conclude that the ALJs do not "have the sovereign power to bind the Government and third parties." Dissent at 1. The dissent also calls this a "difference that makes all the difference" between the SEC's ALJs and "the special trial judges at issue in" <u>Freytag</u>. <u>Id.</u>

The dissent additionally states that "even where special trial judges" in <u>Freytag</u> "could not enter binding decisions, their initial decisions had binding effect" because the Tax Court was "*required* to presume correct" their "factual findings, including findings of intent, and to defer to [a] special trial judge's determinations of credibility." <u>Id.</u> at 2 (citations omitted). The dissent is undoubtedly correct that "[s]uch deference was a delegation of significant authority to the special trial judges." <u>Id.</u> As the dissent goes on to explain, "[m]any cases before the Tax Court . . . involve critical credibility assessments, rendering the appraisals of the special trial judge who presided at trial vital to the Tax Court's ultimate determination. And . . . findings of fact often conclusively decide tax litigation, as they did in" <u>Freytag</u>. <u>Id.</u> at 2–3 (quotation marks, alteration, and citation omitted). The dissent is also correct that, "it cannot be reasonably disputed that findings of fact 'may well be determinative of guilt or innocence.'" <u>Id.</u> (quoting <u>Napue v. Illinois</u>,

8

360 U.S. 264, 269 (1959)). Indeed, as Napue emphasized, assessing the "truthfulness and reliability of a given witness" during live testimony is one such critical factual determination. 360 U.S. at 269.

The dissent rightly points out that if an agency deferred to its personnel on such critical issues, "the Appointments Clause would be offended." Dissent at 5 n.1. But the dissent then applies these statements in an attempt to distinguish the special trial judges imbued with that authority from the SEC's ALJs: "The Securities and Exchange Commission, by contrast, is not required to give its ALJs any deference" and "may review its ALJs' conclusions of law and findings of fact de novo." Id. at 6. At the same time, however, the dissent admits that the "SEC may sometimes defer to the credibility determinations of its ALJs." Id. at 7 n.3. And the dissent does not attempt to reconcile that concession with its earlier-stated admission that credibility assessments may be outcome determinative. Lucia relied in part on this same distinction. 832 F.3d at 286 (stating that the SEC conducts "*de novo* review" of its ALJs' decisions); id. at 288 (stating that the SEC "reviews an ALJ's decisions *de novo*," but acknowledging that the SEC "may sometimes defer to the credibility determinations of its ALJs," and citing Landry, 204 F.3d at 1133, and the SEC's own regulations and orders sanctioning this practice).

This characterization of the SEC's actual process of reviewing its ALJs' decisions is wrong, notwithstanding its attempt to characterize its review as "de novo." David F. Bandimere, SEC Release No. 9972, 2015 WL 6575665, at *20 (Oct. 29, 2015). In footnotes 83 and 114 of its opinion in Mr. Bandimere's case, the SEC reveals the full effect of affording its ALJs the very deference that the dissent explains runs afoul of the Appointments Clause. Id. at *15 n.83, *20 n.114. Specifically, the SEC determined that

9

Mr. Bandimere's "falsely telling [Mr.] Loebe that excess profits would go to a Christian charity rather than to pay him [was] evidence of [his] intent to deceive." Id. at *15. In making that determination, the SEC explained that Mr. "Bandimere testified that he did not remember making this statement to [Mr.] Loebe, but the ALJ found [Mr.] Loebe's testimony more credible than [Mr.] Bandimere's as to this issue." Id. at *15 n.83. Then, instead of rendering its own credibility determination with respect to the conflicting testimony, the SEC applied its rule that "[a]n ALJ's credibility findings are entitled to considerable weight." Id. (citations omitted). The SEC thus engages in deferential, not de novo review of key aspects of its ALJs' decisions.

The SEC admitted as much when it addressed Mr. Bandimere's Appointments Clause challenge. It professed to review its "ALJs' decisions de novo." Id. at *20. The dissent simply takes the SEC at its word. Yet the SEC added the following caveat to that statement: "We do not view the fact that we accord Commission ALJs deference in the context of demeanor-based credibility determinations to afford our ALJs with the type of authority that would qualify them as inferior officers." Id. at *20 n.114. The SEC attempted to shore up its conclusion on this Article II question with the disclaimer that it "will disregard explicit determinations of credibility when [its] de novo review of the record as a whole convinces [it] that a witness's testimony is credible (or not) or that the weight of the evidence warrants a different finding as to the ultimate facts at issue." Id. (quotation marks and citations omitted).

But that proviso is cold comfort to a defendant, like Mr. Bandimere, whose liability for massive civil penalties depends in no small part on the United States's assessment of his credibility during live testimony, credibility determined by the only government

10

employee designated to preside over that testimony—an ALJ. And whatever the SEC means by its disclaimer, it does not equate to de novo review. Rather, whether the SEC disagrees with its ALJs' credibility determinations triggers its own rule that an ALJ's evaluation of a witness's live testimony is entitled to "considerable weight." Id. at *15 n.83. Thus, at minimum, the SEC's ALJs exercise significant discretion over issues of credibility, unchecked by faux "de novo" review.

As the dissent concedes, affording bureaucrats such deference permits them to exercise the sovereign authority of the United States in an often-outcome-determinative fashion that is incompatible with the Appointments Clause. Therefore, even under the dissent's (and Lucia's) truncated Freytag analysis, the majority correctly holds that the SEC's ALJs are inferior Officers.

**15-9586**, Bandimere v. SEC

**McKAY**, Circuit Judge, dissenting

Notwithstanding the majority's protestations otherwise, today's opinion carries repercussions that will throw out of balance the teeter-totter approach to determining which of all the federal officials are subject to the Appointments Clause. While the Supreme Court perhaps opened the door to such an approach in *Freytag v. Commissioner*, 501 U.S. 868 (1991), I would not throw it open any further, but in my view that is exactly what the majority has done. I do not believe *Freytag* mandates the result proposed here, and the probable consequences are too troublesome to risk without a clear mandate from the Supreme Court. I respectfully dissent.

The majority compares SEC ALJs to the Tax Court's special trial judges, and it reasons that because the duties of an ALJ are enough like those of a special trial judge, ALJs must be "Officers" too. But the similarities between *Freytag* and this case matter far less than the differences. Most importantly, the special trial judges at issue in *Freytag* had the sovereign power to bind the Government and third parties. SEC ALJs do not. And under the Appointments Clause, that difference makes all the difference. *See Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 73–74 (2007); *Raymond J. Lucia Companies v. SEC*, 832 F.3d 277, 285–87 (D.C. Cir. 2016).

The requirements of the Appointments Clause are "designed to preserve political accountability relative to important Government assignments." *Edmond v. United States*, 520 U.S. 651, 663 (1997). It ensures that members of the executive branch cannot

- 1 -

"escape responsibility" for significant decisions by hiding behind unappointed officials or otherwise "pretending that" those decisions "are not [their] own." *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010). Such government officials— "those who exercise the power of the United States" —must be "accountable to the President, who himself is accountable to the people." *Dep't of Transp. v. Ass'n of Am. R.Rs.*, 135 S. Ct. 1225, 1238 (2015) (Alito, J., concurring).

It is not surprising, then, that the Tax Court's special trial judges were held to be officers in *Freytag*. 501 U.S. at 881–82. It is clear from the context, if not the *Freytag* opinion, that these special trial judges had been delegated significant authority—much more authority than SEC ALJs. In some cases, special trial judges could enter final decisions on behalf of the Tax Court. *Freytag*, 501 U.S. at 882. In those cases, it was conceded in *Freytag* that the special trial judges acted as inferior officers. *Id.* But even where special trial judges could not enter final decisions, their initial decisions had binding effect.

Where the special trial judges did not issue a final decision, the Tax Court was still *required* to presume correct the special trial judge's factual findings, including findings of intent, and to defer to the special trial judge's determinations of credibility. *See Landry v. FDIC*, 204 F.3d 1125, 1133 (D.C. Cir. 2000). Such deference was a delegation of significant authority to the special trial court judges. Many cases before the Tax Court, including the ones at issue in *Freytag*, "involve critical credibility assessments, rendering the appraisals of the [special trial] judge who presided at trial vital to the Tax Court's ultimate determinations." *Ballard v. Comm'r*, 544 U.S. 40, 60 (2005). In

*Ballard*, for example, "[t]he Tax Court's decision repeatedly [drew] outcome-influencing conclusions regarding the credibility of Ballard . . . and several other witnesses." *Id*. And as the *Freytag* petitioners argued, "[f]indings of fact often conclusively decide tax litigation, as they did in [that] case. Pet'rs' Br. at 23, *Freytag v. Comm'r*, 501 U.S. 868 (1991) (No. 90-762), 1991 WL 11007938. Thus, even when the special trial judge was not authorized to enter a final decision, his initial report often decided the case. The majority says this overstates the role of special trial judges, but it cannot be reasonably disputed that findings of fact "may well be determinative of guilt or innocence." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The majority barely mentions that the Tax Court was "required to defer" to the special trial judges' factual and credibility findings "unless they were clearly erroneous." *Landry*, 204 F.3d at 1133. But the powers of the special trial judges must be understood in context. As *Freytag* illustrates, a special trial judge's initial decision is not like an ALJ's—it is the difference between chiseling in stone and drafting in pencil.

The majority also fails to appreciate that the Tax Court appeared to defer to its special trial judges on conclusions of law as well. But this point was squarely before the Supreme Court. As the *Freytag* petitioners argued, "[i]n practice, special trial judge factual findings and legal opinions are routinely adopted verbatim by the regular Tax Court judges to whom they are assigned." Brief for Petitioner, *supra*, at 7. Between 1983 and 1991, when *Freytag* was decided, every initial report submitted by a special trial judge was purportedly adopted verbatim—a fact made known to the *Freytag* Court. *See* Pet'rs' Br., *supra*, at 6–10.

- 3 -

Every reported decision, including the Tax Court's decision in *Freytag*, "invariably beg[an] with a stock statement that the Tax Court judge 'agrees with and adopts the opinion of the special trial judge.'" *Ballard*, 544 U.S. at 46 (citation omitted) (original brackets omitted); *see, e.g.*, *Freytag v. Comm'r*, 89 T.C. 849, 849 (1987) ("The Court agrees with and adopts the opinion of the Special Trial Judge that is set forth below."). Following that disclaimer was an opinion issued in the name of the special trial judge.

*Freytag* thus illustrates another point that the majority misses: the Tax Court may not have even reviewed the supposedly nonfinal decisions of its special trial judges. As the *Freytag* petitioners argued before the Supreme Court, that case was "a perfect example of how special trial judges routinely do the Tax Court's work with only the most cursory supervision, if any." Pet'rs' Br., *supra*, at 23. There, "after one of the longest trials in Tax Court history," which involved "14 weeks of complex financial testimony spanning two years of trial" and which produced "9,000 pages of transcript and . . . 3,000 exhibits," the Tax Court purported to adopt the special trial judge's report—verbatim— and filed it as the Tax Court's decision on the very same day it received the report. *Id.* at 23, 9. As the *Freytag* petitioners argued to the Supreme Court, "[t]he special trial judge's filing of his report and its verbatim adoption by [Tax Court] Chief Judge Sterrett appear from the record to have been virtually simultaneous." *Id*. at 8. That decision resolved several unsettled, important legal questions. Yet, according to the docket, the Tax Court

judge filed the decision as his own on the same day that the special trial judge filed his

proposed findings and opinions. *See id.*[1]

---

[1]  The majority's emphasis on *Ballard* is misplaced; that case has little to do with the question before us.  In *Ballard*, a case decided 14 years after *Freytag*, the government averred that a Tax Court special trial judge's report was treated as an "in-house draft to be worked over collaboratively by the regular [Tax Court] judge and the special trial judge." *See* 544 U.S. 40, 57.  The majority puts this averment forward as fact, but the *Ballard* Court "[did] not know what happened in the Tax Court, a point that is important to underscore here." *Ballard*, 544 U.S. at 67 (Kennedy, J., concurring).  Indeed, the Court could not have known:  the special trial judges' initial reports were not disclosed even to the Supreme Court.  As the concurring opinion clarified, *Ballard* should be interpreted "as indicating that there might be such a practice, not that there is." *Id*.  The majority ignores this.  The majority also fails to explain why *Ballard* should color an interpretation of *Freytag* when the purported practice had not yet been disclosed, let alone put in front of the *Freytag* Court.

The majority next states that there is "no indication" the Tax Court judge in *Freytag* adopted the STJ's report "verbatim"—but the Tax Court judge purported to do just that. *Freytag*, 89 T.C. at 849.  Indeed, "[i]n the 880 cases heard between . . . 1983 and . . . 2005, there appear to be no instances in which a special trial judge issued a report and recommendation that the Tax Court publicly modified or rejected." Christopher M. Pietruszkiewicz, *Conflating Standards of Review in the Tax Court: A Lesson in Ambiguity*, 44 Houston L. Rev. 1337, 1360 (2008).  What's more, after *Ballard* was decided, the Tax Court tried to make good by releasing the undisclosed reports from every case heard initially by a special trial judge since 1983.  Louise Story, *Tax Court Lifts Secrecy, Putting Some Cases in New Light*, N.Y. Times, Sept. 24, 2005, at C6.  It could find initial reports in only 117 of the 923 cases. *Id*.  Of those 117 cases, the Tax Court modified the special trial judges' recommendations only 4 times. *Id*.  Such figures demonstrate the level of deference afforded to special trial judges.

Following its lengthy discussion of the Tax Court's purported collaborative practice, the majority says "[w]hat really counts . . . are the STJs features the Supreme Court relied on" in *Freytag*.  Maj. Op. at 35.  But *Freytag* did not "rely" on this purported practice—indeed; it had not yet been disclosed by the Tax Court.  Taking the majority at its word, its own reliance on *Ballard* seems out of place.  Instead, we should look to what was actually before the *Freytag* Court.

In any event, whether the Tax Court in practice deferred to the special trial judges on both facts and law, or whether it directed the outcome of a case while escaping responsibility by disclaiming the decision is a distinction without a difference.  Either way, the Appointments Clause would be offended.

- 5 -

The *Freytag* petitioners' point was that special trial judges had as much authority as Tax Court judges themselves. The petitioners referred to them as "full-fledged surrogates for the Tax Court judges," who "exercise virtually the same powers as presidentially-appointed Tax Court judges." *Id.* at 12, 27. The Supreme Court, then, was thoroughly briefed on the true power of the special trial judges: In some cases, special trial judges could enter final decisions on behalf of the Tax Court. In others, special trial judges had, by rule, near-final say on outcome-determinative facts. And in practice they had de facto power "to issue findings and opinions that may be adopted verbatim by the Tax Court without meaningful review even in the most complex, significant and far-reaching cases, as they were [in *Freytag*]." *Id.* at 27. Thus, the special trial judges exercised "significant authority pursuant to the laws of the United States." *Freytag*, 501 U.S. at 881 (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)).[2]

The majority says that "SEC ALJs closely resemble the STJs described in *Freytag*." Maj. Op. at 21. But that is simply not the case. The Securities and Exchange Commission, by contrast, is not required to give its ALJs any deference. The Commission may review its ALJs' conclusions of law and findings of fact de novo. 17 C.F.R. § 201.411(a). It employs ALJs in its discretion, and all final agency orders are those of the Commission, not of its ALJs. An ALJ serving as a hearing officer prepares

---

[2]    Put another way, the special trial judges had been delegated a portion of the sovereign powers of the federal government; they could act on behalf of the Tax Court, and they had the power to bind third parties and the government itself. *See Lucia*, 832 F.3d at 285. Delegated sovereign authority has long been understood to be a key characteristic of a federal "office." *See* 31 Op. O.L.C. 73 (reviewing historical precedents leading up to *Buckley*). And it is delegated sovereignty that is lacking here.

only an "initial decision." *Id*. § 201.360(a)(1). And at any time during the administrative process, the Commission may "direct that any matter be submitted to it for review." *Id*. § 201.400(a). The Commission thus "retains plenary authority over the course of its administrative proceedings and the rulings of its law judges—both before and after the issuance of the initial decision and irrespective of whether any party has sought relief." Mendenhall, Exchange Act Release No. 74532, 2015 WL 1247374, at *1 (Mar. 19, 2015).[3]

On appeal, the Commission is not limited by the record before it. It "may expand the record by hearing additional evidence" itself or it may "remand for further proceedings." Bandimere, SEC Release No. 9972, 2015 WL 6575665 (Oct. 29, 2015) (internal quotation marks and brackets omitted). The Commission "may affirm, reverse, modify, set aside" the initial decision or remand, "in whole or in part," and it "may make any findings or conclusions that in its judgment are proper and on the basis of the record." 17 C.F.R. § 201.411(a). If "a majority of participating Commissioners do not agree to a disposition on the merits, the initial decision shall be of no effect." *Id*. § 201.411(f).

The majority says that, like special trial judges, SEC ALJs also "exercise significant discretion." Maj. Op. at 19. But again the majority misses the point. It is not

---

[3]     It is true, as the majority points out, that the Commission may sometimes defer to the credibility determinations of its ALJs. But because the Commission has retained plenary authority over its ALJs, it is "not required to adopt the credibility determinations of an ALJ." *Lucia*, 832 F.3d at 288 (citation omitted). By contrast, the Tax Court was *required* to defer to its special trial judges. In my estimate, this power to bind the government is, in large part, what separates "purely recommendatory power" from "significant authority," and ALJs from special trial judges.

- 7 -

about day-to-day discretion—the Appointments Clause does not care about *that*. Special trial judges "exercise[d] significant discretion" in setting the record because the Tax Court was required to defer to its special trial judges' findings. We say, for example, that a "district court has significant discretion in sentencing" because we "review for abuse of discretion." *United States v. Tindall*, 519 F.3d 1057, 1065 (10th Cir. 2008); *see also, e.g.*, *Murphy v. Deloitte & Touche Grp. Ins. Plan*, 619 F.3d 1151, 1164 (10th Cir. 2010) (recognizing that a district court has "substantial discretion in handling discovery requests," because our standard of review is highly deferential). Similarly, a special trial judge had "significant discretion" because the Tax Court had to review its findings equally deferentially. The Commission, by contrast, does not have to review its ALJ's opinions with any deference. An SEC ALJ, thus, does not exercise "significant discretion" in any meaningful way.

SEC ALJs, then, possess only a "purely recommendatory power," *Landry*, 204 F.3d at 1132, which separates them from constitutional officers. The Supreme Court has suggested as much. *See Free Enter. Fund*, 561 U.S. at 507. In *Free Enterprise Fund*, the Court explained that its holding "does not address that subset of independent agency employees who serve as administrative law judges" and that "unlike members of the [Public Company Accounting Oversight] Board," who *were* officers, "many administrative law judges . . . perform adjudicative rather than enforcement or policymaking functions, or possess purely recommendatory powers." *Id*. at 507 n.10 (citation omitted).

The results speak for themselves: Unlike the Tax Court, which purported to adopt its special tax judges' opinions verbatim in 880 out of 880 cases between 1983 and 2005, the Commission followed its ALJs' recommendations in their entirety in only 3 of the 13 appeals decided thus far in 2016.[4] In the other 10 cases, the Commission disagreed with its ALJs for various reasons: In one case, the Commission reversed its ALJ because the SEC Enforcement Division failed to meet its burden; in another, it held that civil penalties, which the ALJ had recommended, were not available due to the statute of limitations.

In the end, then, it is the Commission that "ultimately controls the record for review and decides what is in the record." *Lucia,* 832 F.3d at 288 (citation omitted); *see also Nash v. Bowen,* 869 F.2d 675, 680 (2d Cir. 1989) (recognizing that, under 5 U.S.C. § 557(b), the agency "retains 'all the powers which it would have in making the initial decision'"). It is the Commission that enters the final order—in all cases—and it is the commissioners who shoulder the blame.

The majority argues that the current process for selecting ALJs "does not lend itself to . . . accountability," Maj. Op. at 23, but it is quite clear where the buck stops.

---

[4] *See* Grossman, Release No. 10227, 2016 WL 5571616 (Sept. 30, 2016); Schalk, Release No. 10219, 2016 WL 5219501 (Sept. 21, 2016); Cohen, Release No. 10205, 2016 WL 4727517 (Sept. 9, 2016); optionsXpress, Inc., Release No. 10125, 2016 WL 4413227 (Aug. 18, 2016); Gonnella, Release No. 10119, 2016 WL 4233837 (Aug. 10, 2016); Aesoph, Release No. 78490, 2016 WL 4176930 (Aug. 5, 2016); Malouf, Release No. 10115, 2016 WL 4035575 (July 27, 2016); J.S. Oliver Capital Management, L.P., Release No. 10100, 2016 WL 3361166 (June 17, 2016); Riad, Release No. 78049, 2016 WL 3226836 (June 13, 2016); Page, Release No. 4400, 2016 WL 3030845 (May 27, 2016); Doxey, Release No. 10077, 2016 WL 2593988 (May 5, 2016); Young, Release No. 10060, 2016 WL 1168564 (March 24, 2016); Wulf, Release No. 77411, 2016 WL 1085661 (Mar. 21, 2016).

Because the Commission is not bound in any way by its ALJ's decisions, unlike the Tax Court, the blame for its unpopular decisions will fall squarely on the commissioners and, in turn, the president who appointed them. So long as the commissioners have been validly appointed, the Appointments Clause is satisfied.

Putting aside that the Commission is not bound—in any way—by an ALJ's recommendations, amici's attempt to analogize SEC ALJs to magistrate judges only serves to highlight the difference between ALJs and constitutional officers. Unlike ALJs, magistrate judges have been delegated sovereign authority and have the power to bind the government and third parties. Magistrate judges are authorized to issue arrest warrants, 18 U.S.C. § 3041; determine pretrial detention, *id*. §§ 3141, 3142; detain a material witness, *id*. § 3144; enter a sentence for a petty offense, without the consent of the United States or the defendant, 28 U.S.C. § 636(a)(4); and issue final judgments in misdemeanor cases and all civil cases with the consent of the parties, *id*. §636(a)(5), (c); 18 U.S.C. §3401. Magistrate judges may also impose sanctions for contempt. 28 U.S.C. § 636(e). SEC ALJs can do none of these things.

The majority's reliance on Supreme Court decisions from the nineteenth century and early twentieth century is equally problematic. The majority's casual citation to these cases might lead one to believe there is a body of caselaw to which we can analogize. But these decisions "often employed circular logic, granting officer status to an official based in part upon his appointment by the head of a department." *Landry*, 204 F.3d at 1132–33. For example, *United States v. Mouat*, 124 U.S. 303 (1888), cited by the majority, held that "[u]nless a person . . . holds his place by virtue of an appointment by

- 10 -

the President, or of one of the courts of justice or heads of Departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States." *Id*. at 307; s*ee also Free Ent. Fund*, 561 U.S. at 539 (Breyer, J., dissenting) (quoting commentary that described "early precedent as 'circular' and [the Court's] later law as 'not particularly useful'").

Finally, I began this dissent by expressing my fears of the probable consequences of today's decision. It does more than allow malefactors who have abused the financial system to escape responsibility. Under the majority's reading of *Freytag*, all federal ALJs are at risk of being declared inferior officers. Despite the majority's protestations, its holding is quite sweeping, and I worry that it has effectively rendered invalid thousands of administrative actions. Today's judgment is a quantitative one—it does not tell us how much authority is too much. It lists the duties of SEC ALJs, without telling us which, if any, were more important to its decision than others and why. And I worry that this approach, and the end result, leaves us with more questions than it answers.

Are all federal ALJs constitutional officers? Take, for example, the 1,537 Social Security Administration (SSA) ALJs,[5] who collectively handle hundreds of thousands of hearings a year.[6] SSA ALJs, like SEC ALJs, are civil service employees in the "competitive service" system. 5 C.F.R. § 930.201(b). In addition to presiding over

---

[5]    *See* Office of Pers. Mgmt., *ALJs by Agency*, https://www.opm.gov/services-for-agencies/administrative-law-judges/#url=ALJs-by-Agency (last visited Oct. 31, 2016). According to the Office of Personnel Management's latest count, there are 1,792 total federal administrative law judges. *Id.*

[6]    *See* SSA, *Annual Performance Report 2014-2016*, Table 3.1h, at 82, available at http://www.ssa.gov/agency/performance/2016/FINAL_2014_2016_APR_508_compliant.pdf.

sanctions actions, which are adversarial, *see* 20 C.F.R. § 404.459, SSA ALJs conduct nonadversarial hearings to review benefits decisions, *see id.* §§ 404.900, 405.1(c), 416.1400. In these proceedings, the claimant may appear, submit evidence, and present and question witnesses. *Id*. §§ 404.929, 404.935, 416.1429, 416.1435. Like SEC ALJs, SSA ALJs "regulate the course of the hearing and the conduct of representatives, parties, and witnesses." *Id.* § 498.204(b)(8). Like SEC ALJs, SSA ALJs administer oaths and affirmations, *see id.* § 404.950, and examine witnesses, *id.* § 498.204(b)(9). Like SEC ALJs, SSA ALJs may receive, exclude, or limit evidence. *Id.* § 498.204(b)(10).

If a claimant is dissatisfied with an SSA ALJ's decision, he may seek the SSA's Appeals Council's review. The Appeals Council may then deny or dismiss the request for review or grant it. *Id*. §§ 404.967, 416.1467. Like the Securities and Exchange Commission, the Appeals Council may also review an ALJ's decision on its own motion. *Id*. §§ 404.969(a), 416.1469(a). After it has reviewed all the evidence in the ALJ's hearing record and any additional evidence received, the Appeals Council will make a decision or remand the case to an ALJ. *Id*. §§ 404.977, 404.979, 416.1477, 416.1479. The Appeals Council may affirm, modify or reverse the ALJ's decision. *Id*. If no review is sought and the Appeals Council does not review the ALJ's decision on its own motion, the ALJ's decision becomes final. *See id*. §§ 404.955, 404.969, 416.1455, 416.1469.

This should all sound familiar. SSA ALJs have largely the same duties as SEC ALJs, and the appeals process appears similar as well. But the parallels between SEC ALJs and SSA ALJs do not end there. Like SEC ALJs, SSA ALJs can hold prehearing conferences, *id.* § 405.330; punish contemptuous conduct by excluding a person from a

hearing, *see* Social Security Administration Hearings, Appeals and Litigation Law Manual (HALLEX), I-2-6-60 (Jan. 15, 2016)[7]; rule on dispositive and procedural motions, 20 C.F.R. § 498.204(b); rule on sanctions, *see* HALLEX, I-2-10-16; and take depositions, *see* HALLEX, I-2-6-22.  Like SEC ALJs, an SSA ALJ "may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing."  20 C.F.R. § 404.950. Like SEC ALJs, though, SSA ALJs cannot enforce or seek enforcement of a subpoena; the SSA itself would have to get an order from a federal district court to compel compliance.  *See* 42 U.S.C. § 405(e).

This is all to say that SEC ALJs are not unique.  I cannot discern a meaningful difference between SEC ALJs and SSA ALJs under the majority's reading of *Freytag*. Indeed, litigants have already begun drawing this precise comparison between SEC ALJs and SSA ALJs.  *See, e.g., Manbeck v. Colvin*, No. 15 CV 2132 (VB), 2016 WL 29631 (S.D.N.Y. Jan. 4, 2016).  Insofar as SSA ALJs are not appointed by the president, a court of law, or the head of a department, *cf. O'Leary v. Office of Pers. Mgmt.*, No. DA-300A-12-0430-B-1, 2016 WL 3365404 (M.S.P.B. June 17, 2016), today's decision risks throwing much into confusion.  "Does every losing party before an ALJ now have grounds to appeal on the basis that the decision entered against him is unconstitutional?" *Free Enter. Fund*, 561 U.S. at 543 (Breyer, J., dissenting).  It certainly seems that way.

---

[7]    Available at https://www.ssa.gov/OP_Home/hallex/hallex-I.html.

And what of the ALJs going forward?  When understood in conjunction with *Free Enterprise Fund*, I worry today's opinion will be used to strip ALJs of their dual layer for-cause protection.  In *Free Enterprise Fund*, the Supreme Court held that "dual for-cause limitations on the removal" of some inferior officers is unconstitutional.  561 U.S. at 492.  Presently, SEC ALJs (and SSA ALJs) have such dual for-cause protection:  An SEC ALJ may only be removed by the Merit Systems Protection Board and only for good cause.  *See* 5 U.S.C. § 7521(a), (b).  The members of the Merit Systems Protection Board are themselves protected from at-will removal.  *Id*. at § 1202.  I appreciate that this issue is not before the court, but today's decision makes it more likely that either ALJs or the Board, or both, will lose this civil service protection.  *See Free Enter. Fund.*, 561 U.S. 477, 542, 525 (2010) (Breyer, J., dissenting).[8]

I am similarly concerned about what the majority's decision portends for untold rules and regulations.  "Although almost all rulemaking is today accomplished through informal notice and comment, the APA actually contemplated a much more formal process for most rulemaking.  To that end, it provided for elaborate trial-like hearings in which proponents of particular rules would introduce evidence and bear the burden of proof in support of those proposed rules."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1222 n.5 (2015) (Thomas, J., concurring) (citing 5 U.S.C. § 556).

---

[8]  Whether federal ALJs should receive such dual for-cause protections is perhaps a question that could be debated, but Congress has already decided this question in favor of protecting ALJs, and the majority opinion shows little concern for the way its decision will overturn congressional intent and disrupt a system that has been in place for decades.

Formal rulemaking proceedings must be presided over by an agency official or an ALJ. An ALJ's function in formal rulemaking is nearly identical to its function in formal adjudications. *See* 5 U.S.C. §§ 556, 557. So, if ALJs are officers for purposes of formal adjudication, as the majority so holds, they must also be officers for formal rulemaking. *See also Freytag*, 501 U.S. at 882 ("Special trial judges are not inferior officers for purposes of some of their duties under § 7443A, but mere employees with respect to other responsibilities. . . . If a special trial judge is an inferior officer for purposes of subsections (b)(1), (2), and (3), he is an inferior officer within the meaning of the Appointments Clause and he must be properly appointed."). Though formal rulemaking is much rarer today, *see Perez* 135 S. Ct. at 1222 n.5, this was not always the case. And I worry that rules and regulations that were promulgated via formal rulemaking before an agency ALJ and are still enforced today are now constitutionally suspect.[9]

Today's holding risks throwing much into disarray. Since the Administrative Procedures Act created the position of administrative law judge in 1946, the federal government has employed thousands of ALJs to help with the day-to-day functioning of the administrative state. *Freytag*, which was decided 25 years ago, has never before been extended by a circuit court to any ALJ. And yet, the majority is resolved to create a

---

[9] Some of these questions could, perhaps, be resolved by an explicit statement that the opinion does not apply retroactively. *See e.g., Buckley*, 424 U.S. at 142 (holding that the appointment of some Commissioners violated the Appointments Clause, but that the "past acts of the Commission are therefore accorded de facto validity," even though "[t]he issue [was] not before [the Court]." *Id*. at 744 (Burger, C.J., concurring in part and dissenting in part)). *But see* Maj. Op. 36 ("Questions about . . . retroactivity are not issues on appeal . . . . we must leave for another day any putative consequences of [our] conclusion.'").

circuit split.  When there are competing understandings of Supreme Court precedent, I would prefer the outcome that does the least mischief.

Furthermore, faced with such uncertainty, "we must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached."  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014). Judicial review must fit the occasion.  In a close case regarding the application of a constitutional rule in a discrete factual setting, and without much precedent to guide us, deference to Congress seems particularly relevant.  I respectfully dissent.